UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| JAMES DAVID DECKER, ) | |
| ) | |
| Plaintiff ) | |
| ) | Case No. 1:08-CV-27 |
| v. ) | |
| ) | Chief Judge Curtis L. Collier |
| CITY OF ATHENS, TENNESSEE, ) | |
| OFFICER MATTHEW NORFLEET, in ) | |
| his individual and official capacity, and ) | |
| OFFICER TRESA STICKER, in her ) | |
| individual and official capacity, ) | |
| ) | |
| Defendants. ) | |

## **MEMORANDUM**

Before the Court is a motion for summary judgment filed by this case's remaining individual Defendants, Officers Matthew Norfleet and Tresa Sticker ("Defendants") (Court File No. 34), with supporting exhibits. Plaintiff James David Decker filed a response with supporting exhibits (Court File No. 37) and Defendants filed a reply (Court File No. 38). Additionally, the Court viewed a DVD video and audio recording ("DVD") manually filed by the City of Athens, Tennessee (Court File No. 27 & Ex. A).[1] After carefully considering these materials, for the following reasons, the Court will **GRANT** Defendants' motion and will **DISMISS** the case.

### I.   RELEVANT FACTS AND PROCEDURAL HISTORY

Plaintiff is a self-described Christian "street preacher" who "regularly engages in open air evangelism and the display of signs intended to communicate the reality of sin and man's need for repentance." (Compl. (Court File No. 1) ¶ 9.) On March 11, 2007, Plaintiff was preaching at the

---

[1] The City of Athens was dismissed from this action on May 12, 2009 (Court File No. 36).

intersection of Decatur Pike and Congress Parkway in Athens (*id.* ¶ 14). The parties' accounts differ as to Plaintiff's exact location while he was preaching. Plaintiff's complaint maintains he was "off the roadway and on the grassy area at the southwest corner of the intersection" where, he alleges, an Athens police officer had previously told him to stand (*id.* ¶ 18). Plaintiff's complaint emphasizes that he was not blocking traffic and that "traffic flowed naturally and unimpeded." (*Id.* ¶¶ 19–21.)

While Plaintiff was preaching, Officer Norfleet drove up in his police vehicle. Unfortunately, the camera view from Officer Norfleet's vehicle does not show Plaintiff's location while Norfleet spoke to him, nor does it show the position of the two relative to each other during their encounter. However, Norfleet testified that Plaintiff was preaching "if not on the curb, within centimeters of the curb," and that "the majority of his body was with [sic] the curb." (Court File No. 34 Ex. 3 ("Norfleet Dep."), at 26.) The DVD recording from Norfleet's vehicle as it approaches the scene shows, if only briefly, a man (presumably Plaintiff) with a sign mounted on his body, standing by where the right lane of the road curves off to make a 90-degree turn to the right. Plaintiff was thus not in the middle of the intersection, but did appear to be standing immediately adjacent to the curb.

When he drove up, Officer Norfleet said to Plaintiff, "If you don't mind, I don't have a problem with you doing this, but you're not going to be able to do it right here in the middle of the intersection, OK?" (DVD 00:20–00:25.) In response, Plaintiff asserted he had a right to be there: "I went and I told him about my rights to preach and all of that." (Court File No. 34 Ex. 1 ("Pl.'s Dep."), at 108.) Officer Norfleet replied "I feel it's a traffic hazard, OK, so I'm going to ask you to move" (DVD 00:40), to which Plaintiff responded "no, I ain't moving." (DVD 00:41.) Norfleet

2

consulted by radio with his supervisor, who instructed him "if it was in [Norfleet's] opinion a traffic problem or safety hazard," Norfleet could ask Plaintiff to move. (Norfleet Dep. 31.) Norfleet informed Plaintiff that he "would not be able to continue at that exact location that he was at, that he would have to move back or move down from the curb," (*id.* at 30), but in response to this, Plaintiff "became upset pretty quick, raised his voice even louder," (*id.*) and refused to leave. Plaintiff, for his part, maintains it was Officer Norfleet who became aggravated and upset (Pl.'s Dep. 108). The Court notes that, on its hearing of the DVD audio, Officer Norfleet's voice seemed calm and reasonable at this point, and that Plaintiff's voice was raised, which Plaintiff admits (*id.* at 112).

Officer Norfleet exited his vehicle and "spoke to Mr. Decker for a brief moment, maybe a minute or two, basically trying to get the message across he would be able to stay if he moved a distance away from the curb." (Norfleet Dep. 34.) In response, Plaintiff and his daughter, Carol Decker, "seemed very irate and shouted condemnation and Biblical verses and stated they had permission to be there and were not going to leave." (*Id.* at 35.) Plaintiff and Carol Decker acknowledge Plaintiff refused to move from the curb (Pl.'s Dep. 108; Court File No. 34 Ex. 2 ("Carol Decker Dep."), at 41).

On the DVD, Officer Norfleet can be heard talking to Carol Decker and then repeatedly saying to Plaintiff, "Sir, back up. Back up, sir." (DVD 02:37.) Norfleet said "back your butt up now," to which Plaintiff responded "Praise the Lord." (DVD 02:40–02:42.) Norfleet testified that at this point, Plaintiff turned around and was "approaching in my direction." (Norfleet Dep. 36.) Norfleet stuck his hand out to stop Plaintiff's movement, then stepped back (*id.*). Plaintiff approached Norfleet again, and again Norfleet stuck out his hand (*id.*). The third time Plaintiff approached Norfleet, Plaintiff was waving his Bible in his hand, and the Bible made contact with

3

Norfleet's nose and forehead (*id.*).² The DVD records Norfleet saying "I'm not trying to hurt anybody. You're trying to shove a Bible in my face." (DVD 03:00.) Norfleet testified that he then "considered that the situation had reached a point to where Mr. Decker should be placed under arrest." (*Id.*)

The DVD then records a cacophony of crosstalk, during which Plaintiff repeated his "Praise the Lord" mantra and Carol Decker can be heard loudly remonstrating "oh my goodness, all glory to God." (DVD 03:00–04:30). During this time, Defendant Officer Sticker arrived at the scene (Norfleet Dep. 39). Both officers asked Plaintiff several times to place his hands behind his back, which Plaintiff admits he refused to do, as he was "stalling for time." (Pl.'s Dep. 119–20.) Norfleet said "I'm about to spray you if you don't put your hands behind your back," (DVD 03:57), and repeated "unless you want to be sprayed, you're gonna put your hands behind your back right now," (DVD 04:13). Norfleet told Plaintiff "if you put [your hands] in front, I don't have a problem with that. If you'll calm down and put 'em in front of you." (DVD 04:33.)

Apparently, Plaintiff persisted in refusing to comply, for Sticker applied a "short burst" of pepper spray, followed by a burst from Norfleet after Plaintiff continued his noncompliance (Norfleet Dep. 46–47).³ Officers Norfleet and Sticker thereupon took Plaintiff to the ground in an intentional fall to place him in handcuffs and bring him into custody (*id.*; Court File No. 34 Ex. 4

---

²Plaintiff opined that if the Bible hit Norfleet, "he run [sic] into it. He was aggravated. He was angry too." (Pl.'s Dep. 114.) Both Plaintiff and his daughter claim Norfleet was the aggressor: "He was pushing me. He got to pushing me." (*Id.*; Carol Decker Dep. 45.) Plaintiff does not, however, appear to dispute what is relevant to Officer Norfleet's subsequent decision: that Plaintiff's Bible made contact with Norfleet's face.

³On the DVD, Officer Sticker can be heard to say "my cuffs, I had to hold on to 'em, he kept jerkin' 'em." (DVD 37:20.)

4

("Sticker Dep."), at 33). Again, Plaintiff and his daughter dispute this account: "So they throwed me to the ground, wrestled me to the ground, and all his weight wound up on me. . . . [My hands] was cuffed. I was throwed to the ground and then pepper sprayed again after that, the best I remember, after they handcuffed me and then tripped me and throwed me to the ground and my face hit the ground." (Pl.'s Dep. 121–22.) Because Officer Norfleet's vehicle camera was pointed away from the altercation, and because there is a long gap of silence on the DVD, the Court cannot verify this sequence of events.

The officers called an ambulance because Plaintiff complained of breathing difficulties (*id.* at 127). Carol Decker ordered the paramedics not to assist her father because of her "serious mistrust" of city officials (Carol Decker Dep. 51–52),[4] and Plaintiff refused medical treatment at the scene (Pl.'s Dep. 127). Officer Norfleet transported Plaintiff to the hospital, where he again refused medical treatment (*id.* at 130). Plaintiff was booked on charges of resisting arrest and assault (Court File No. 37 Ex. 1, at 1), though the charges against him were later dismissed (Pl.'s Dep. 148–50).

Plaintiff brought this action under 42 U.S.C. § 1983, stating causes of action in his First Amendment rights to free exercise of religion and free speech, his Fourth Amendment freedom from unconstitutional seizure, state law assault and battery claims, and his Eighth Amendment right to freedom from cruel and unusual punishment and excessive force.[5] Plaintiff requested nominal and

---

[4] Carol Decker claims the paramedics "came laughing up to the scene," (Carol Decker Dep. 51), but in reviewing the portion of the DVD where the paramedics arrive, the Court did not observe the paramedics laughing.

[5] As Defendants correctly point out, claims for excessive force are properly brought under the Fourth Amendment, not the Eighth Amendment. *See Graham v. Connor*, 490 U.S. 386, 388 (1989). The Eighth Amendment applies "as the primary source of substantive protection" only after conviction. *See Whitley v. Albers*, 475 U.S. 312, 327 (1986). As such, the Court will analyze Plaintiff's excessive force claim under the relevant Fourth Amendment standard.

5

compensatory damages (including damages for physical injury and medical treatment), punitive damages, and attorney's fees under 42 U.S.C. § 1988.

## II. STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the burden rests on the movant to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court must view the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). It is the Court's duty to determine if the non-movant has presented sufficient evidence to raise issues of fact; however, the Court does not weigh evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

At the same time, the purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 (advis. comm. notes) (1963). The movant must demonstrate the absence of a genuine issue of material fact, but the non-movant is not entitled to a trial solely on the basis of its allegations. The non-movant must submit significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324. A scintilla of evidence is not enough; the non-movant must present evidence sufficient for a jury to reasonably

6

find for its side. *Liberty Lobby*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The movant is entitled to summary judgment if the non-movant fails to make a satisfactory showing on an essential element of its case for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. It is the Court's role to decide if a fair-minded jury could return a verdict for the non-moving party, or if "the evidence . . . is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

### III. DISCUSSION

Defendants move for summary judgment on each of Plaintiff's claims, on the grounds that (1) they committed no constitutional violation, and (2) even if there was a constitutional violation, they are entitled to qualified immunity. The Court will not reach the qualified immunity argument because it finds Plaintiff has presented no set of facts under which a reasonable jury could find a constitutional violation.

#### A. First Amendment

Defendant moves for summary judgment on both of Plaintiff's First Amendment theories: violation of the Free Exercise clause, and infringement of his right to free speech. Plaintiff counters that he can support a claim for violations of his First Amendment rights.

The text of the First Amendment, applied to the states through the Fourteenth Amendment, prohibits the government from making any law "respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech." U.S. Const. amend. I. Despite Plaintiff's protestations to the contrary, however, almost no Justice of the Supreme Court

has held the First Amendment is absolute under all circumstances. While freedom of speech "is the matrix, the indispensable condition, of nearly every other form of freedom," *Palko v. Connecticut*, 302 U.S. 319, 327 (1937), it "must be balanced against the state's responsibility to protect other important rights," *Spingola v. Vill. of Granville*, 39 F. App'x 978, 981 (6th Cir. 2002). Further, state and local entities indubitably retain the ability, under the police power, to pass laws designed to further the general health, well-being, and safety of their citizens. *Kovacs v. Cooper*, 336 U.S. 77, 83 (1949).

To that end, governments will pass laws under the police power that, while facially neutral, may incidentally burden certain religious exercises. The Supreme Court has unequivocally ruled, however, that when it comes to such facially neutral laws of general applicability, those laws are permissible notwithstanding any incidental burdens they impose, so long as the laws pass rational basis review. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Only if a law burdens religious exercise because it is not actually neutral or generally applicable must it be "justified by a compelling governmental interest" and be "narrowly tailored to advance that interest." *Id.* at 531–32 (citing *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990)). Otherwise, the law need only meet the deferential standard of rational basis scrutiny, which requires the law be a rational means to furthering a legitimate government end. *See, e.g.*, *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

In this case, the city of Athens, pursuant to its police power, had in effect an ordinance governing interference with traffic: "It shall be unlawful for any person to stand, sit, or engage in any activity whatever on any public street, sidewalk, bridge, or public ground in such a manner as to prevent, obstruct or interfere with the free passage of pedestrian or vehicular traffic thereon."

8

ATHENS, TENN. MUNICIPAL CODE § 11-704 (1995), *available at* http://www.mtas.utk.edu/public/municodesweb.nsf?OpenDatabase. On its face, the law makes no reference to the religious affiliation of those to whom it applies, nor to the type of activity in which they are engaged. And, though facial neutrality alone is not determinative, *Church of the Lukumi Babalu Aye*, 508 U.S. at 534, the Court can detect no evidence (and Plaintiff has submitted none) that Athens enacted this ordinance to target a particular religious group, as the city of Hialeah did in that case. Rather, the law regulates activity without any reference to the ideas or views expressed by the activity, even if it happened to incidentally burden Plaintiff. *See City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 47–48 (1986).

The ordinance is also of general applicability. Under the ordinance's text, it would not have mattered whether Plaintiff was preaching the Gospel, publicly praying to Allah, conducting a séance, selling fruits and vegetables, making a political speech, or participating in any other religious or non-religious activity. The ordinance is clear that "any activity whatever" is prohibited when it is done "in such a manner as to prevent, obstruct or interfere with the free passage of pedestrian or vehicular traffic." Given, then, that the ordinance is facially neutral and of general applicability, it must only withstand rational basis scrutiny. Athens, like all cities, has at least a legitimate interest—indeed, a substantial or even compelling one—in traffic safety and protecting the lives of drivers and pedestrians who operate within its boundaries. Prohibiting activity that prevents, obstructs, or interferes with traffic is, of course, a rational means to achieve that interest.

The Court's conclusion that this law is neutral in its design is bolstered by the DVD evidence showing the neutrality of its application by Officer Norfleet. The officer repeatedly made clear he did not have a problem with the religious content of Plaintiff's activity; it was only Plaintiff's

9

location with which Norfleet was concerned. Norfleet offered Plaintiff alternatives so Plaintiff could continue preaching—he could move farther back into the grassy area,[6] or move along the street and off the curb—but Plaintiff refused them. Plaintiff argues that in a previous encounter with an Athens police officer, that officer had told him it was permissible to stand where he was standing during his encounter with Norfleet (Pl.'s Dep. 76, 78). However, even taking the record in the light most favorable to Plaintiff (as the Court must), the officer told Plaintiff he could preach in "that area in the grass"—apparently referring to the grassy area where Plaintiff could have moved during his encounter with Officer Norfleet. He did not instruct Plaintiff to preach on the curb or next to the road. Officer Norfleet offered Plaintiff the same option as he had allegedly been given by the first officer: he was free to preach in the grassy area to his heart's content, but could not do so immediately next to the road.

    Here, Officer Norfleet perceived Plaintiff's position next to the road would cause a traffic hazard. After radioing his supervisor, Norfleet's supervisor confirmed Norfleet could ask Plaintiff to move if Norfleet felt Plaintiff posed a traffic hazard. Plaintiff's argument there were no reports he was conducting his activity in a dangerous manner, and that he was not blocking traffic, is irrelevant. Police officers are "entitled to decide that [a] situation present[s] a danger to drivers without waiting for an accident to occur." *Frye v. Police Dep't of Kan. City*, 260 F. Supp. 2d 796, 799 n.3 (W.D. Mo. 2003) (citing *Ass'n of Cmty. Orgs. for Reform Now v. St. Louis County*, 930 F.2d 591, 596 (8th Cir. 1991)). Plaintiff's attempt to blame any traffic problems on the position of Norfleet's vehicle during the altercation (Compl. ¶¶ 20–22) is similarly unavailing. Any resulting

---

[6]Given the high volume at which Plaintiff admits he was preaching (and which is apparent on the DVD), his message would have reached passing vehicles just as effectively if he had been located, say, three feet back from the curb, instead of immediately adjacent to it.

10

traffic problems, to the extent they happened at all (and the record does not indicate such problems), would have occurred because Norfleet lawfully perceived a potential traffic hazard posed by Plaintiff and asked him to correct the problem. The fact the situation escalated to the point that Norfleet's cruiser had to be positioned in the turning lane as long as it did has nothing to do with his original perception—permissibly based on his discretion as a police officer—that Plaintiff's conduct created a safety hazard to himself and other drivers.

For these reasons, summary judgment is appropriate on Plaintiff's Free Exercise claim.

Next, in opposing the motion for summary judgment on his free speech claim, Plaintiff alludes to—but does not specifically raise or cite authority for—a First Amendment "traditional public forum" argument. Because the Court must construe the facts in the light most favorable to Plaintiff, it will address this argument because Plaintiff contends "there were no applicable valid time place or manner restrictions" that regulated his preaching (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. 9).

The Supreme Court has recognized three categories of public property in the First Amendment context: the traditional public forum, designated public fora, and the nonpublic forum. *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678–79 (1992). Relevant here is the traditional public forum, which covers "government property that has traditionally been available for public expression," such as parks, streets, and sidewalks.[7] *Id.* When the government enacts a regulation affecting speech activity in a traditional public forum—a so-called time, place, or manner restriction—the regulation must be content-neutral, serve a substantial government interest, be

---

[7]Though it is not clear from the record, the Court assumes, without holding, that the "grassy area" and area immediately adjacent to the street were city-owned rights-of-way and could be considered the type of area traditionally used for expressive activity.

11

narrowly tailored to serve that interest, and leave open ample alternative channels for communicating the desired message. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see also City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994); *Frisby v. Schultz*, 487 U.S. 474, 481 (1988).

Here, the city of Athens' traffic ordinance was content-neutral for the reasons described above. The foregoing discussion also made clear the city's substantial interest in preventing traffic hazards and enhancing the safety of drivers and pedestrians. *See Schneider v. New Jersey*, 308 U.S. 147, 160 (1939). The ordinance is narrowly tailored in that it serves Athens's interest in traffic safety while only proportionately burdening speech that directly implicates that interest. Speakers, or street preachers like Plaintiff, are free to convey their message on public rights-of-way as long as they are not positioned such that they pose a hazard to traffic. *See Ward v. Rock Against Racism*, 491 U.S. 781, 796–97 (1989) ("[R]estrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech.") (internal citations omitted). Relatedly, Officer Norfleet's enforcement of the ordinance left open ample alternative channels for Plaintiff's message. Again, Plaintiff could have moved a few feet back while remaining on the grassy area or moved down the street where he presented less of a traffic hazard. Based on Plaintiff's considerable vocal volume he used while preaching his message (to which he freely admits), the Court is hard-pressed to conclude that such movement would have diminished the effectiveness or content of his message in any way.

For these reasons, Plaintiff's free speech claim must also fail. Accordingly, the Court will **GRANT** Defendant's motion for summary judgment on Plaintiff's First Amendment claim.

    **B.**    **Fourth Amendment**

12

Defendants argue they are entitled to summary judgment on Plaintiff's Fourth Amendment claims for unconstitutional seizure and excessive force. Plaintiff argues he can prove a factual basis to support his excessive force claim.

In evaluating Fourth Amendment excessive force claims, the Court employs an "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). This standard requires that the use of force in making an arrest be reasonable under the circumstances. *Id.* at 395. It is a fact-based inquiry, focusing on several factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. A court must judge the "reasonableness" of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Finally,

> [w]ith respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97 (internal citations omitted).

Here, based on the Court's viewing of the DVD recording and its reading of deposition testimony, Officer Norfleet initially approached Plaintiff in a courteous, even friendly, manner. The Court listened to the tone of voice Officer Norfleet used as he initially encountered Plaintiff, and nothing in his tone sounded remotely threatening or condescending; on the contrary, Norfleet sounded eminently reasonable and willing to work with Plaintiff, even as Plaintiff constantly interrupted him. Plaintiff, in contrast, kept his voice raised from the very start of their encounter as

13

he continued his preaching, a fact to which Plaintiff eagerly admits (Pl.'s Dep. 112–13 ("I was doing right like this screaming out my message.")) and which is apparent from the DVD. After he exited the vehicle, Officer Norfleet was drawn into a confrontation with Plaintiff (who approached his vehicle and Norfleet personally). The confrontation escalated, and Plaintiff approached Norfleet in a physical and aggressive manner once, twice, then three times (Norfleet Dep. 37–38). Norfleet put out his hand and retreated from Paintiff each time, indicating he should stop his advances. On the third advance, Plaintiff's Bible made contact with Norfleet's nose and forehead (*id.* at 39), and Norfleet placed Plaintiff under arrest as a result. Even after Norfleet made clear he was going to arrest Plaintiff, he offered to let Plaintiff place his hands in front of his body for handcuffing, if only Plaintiff would calm down. Again, Plaintiff refused this entreaty. Thus, Officer Norfleet, and Officer Sticker when she arrived on the scene, faced a Plaintiff who was yelling loudly, refusing to comply with orders, approaching one of the officers menacingly, and who had committed an unconsented touching against Officer Norfleet with his Bible.

Plaintiff, unsurprisingly, takes umbrage with the officers' use of pepper spray against him. The United States Court of Appeals for the Sixth Circuit has held that using pepper spray on a handcuffed and hobbled person constitutes excessive force, as does its use "when a detainee has surrendered, is secured, is not acting violently and does not pose a threat to officers or anyone else." *Grawey v. Drury*, — F.3d —, 2009 WL 1479017, at *5 (6th Cir. May 28, 2009) (citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004)). Pepper spray's use also constitutes excessive force when an officer "pepper sprays a suspect who has not been told she is under arrest and is not resisting arrest." *Id.* at *6. However, that court has also upheld pepper spray's use in limited circumstances, "including where a detainee is unsecured, acting violently, and posing a

14

threat to himself or others." *Cabaniss v. City of Riverside*, 231 F. App'x 407, 413 (6th Cir. 2007) (citing *Gaddis v. Redford Twp.*, 364 F.3d 763, 774 (6th Cir. 2004); *Monday v. Oullette*, 118 F.3d 1099 (6th Cir. 1997)).

Here, Plaintiff alleges the officers sprayed him three or four times with pepper spray. While this is contradicted by the consistent testimony of Officers Norfleet and Sticker (both of whom testified Plaintiff was sprayed twice), even resolving this conflict in Plaintiff's favor, the Court would still find the officers' use of pepper spray reasonable under the circumstances. The officers were confronted with a man who (1) approached one of them in a threatening manner three times, (2) used his Bible to make contact with Officer Norfleet's face, (3) repeatedly resisted being placed in handcuffs after being told he was under arrest, (4) knocked Officer Norfleet's pepper spray bottle out of his hand (Sticker Dep. 33), (5) was by his own admission screaming at the top of his lungs and ignoring lawful commands, and (6) had present at the scene a daughter who was "screaming and yelling" while the officers were trying to effectuate the arrest (*id.* at 31; DVD 03:00–04:30). Plaintiff was not a small man; he stood over six feet tall and weighed approximately 225 pounds (Pl.'s Dep. 164). Officer Norfleet testified Plaintiff was still out of handcuffs when the officers applied their pepper spray bursts, and the pepper spray was necessary to get Plaintiff to comply with their verbal commands to place his hands so he could be handcuffed (Norfleet Dep. 46). In fact, even the pepper spray was not completely effective—the officers had to take Plaintiff to the ground in a controlled fall to finally place him in custody (*id.*). Plaintiff had clearly not surrendered and was not already secured, which were the circumstances rendering pepper spray's use inappropriate in *Grawey*. Given these chaotic circumstances, the Court concludes the officers acted reasonably in the situation. Their conduct came nowhere close to the level of excessive force required for a Fourth

15

Amendment claim.

In attempting to counter Defendants' motion, Plaintiff asserts his "deposition testimony was clear" that the officers put their weight on Plaintiff, sprayed him with pepper spray, and caused him to feel he was choking to death. However, these vague allegations, contained in one brief paragraph without any citations to the record (Court File No. 37, at 11) do not suffice to satisfy Plaintiff's burden of coming forward with "significant probative evidence" to support his claim. *Celotex*, 477 U.S. at 324. The Court will not sift through the record to find this evidence, as that obligation is Plaintiff's, not the Court's. *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007). Mindful of its obligation to view the facts in the light most favorable to Plaintiff, the Court is nevertheless convinced no reasonable jury could find the officers used excessive force in effectuating Plaintiff's arrest.

Turning to Plaintiff's unlawful seizure claim, the Court construes this as a claim he was improperly arrested. An arrest must be based on probable cause, *see, e.g.*, *Maryland v. Pringle*, 540 U.S. 366, 370 (2003), which exists where "the events leading up to the arrest . . . viewed from the standpoint of an objectively reasonable police officer, amount to probable cause," *id.* at 371 (internal citations omitted). "The establishment of probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Moncivais*, 401 F.3d 751, 756 (6th Cir. 2005) (internal citations omitted).

In this case, Plaintiff approached Officer Norfleet two times; on each occasion, Norfleet extended his hand to indicate Plaintiff should stop his advances. The third time, Plaintiff approached Norfleet again, waving his Bible in his hand, and the Bible made contact with Norfleet's face. Neither Plaintiff nor his daughter who was at the scene dispute that his Bible contacted Norfleet;

16

instead, Carol Decker attempts to blame the situation on Norfleet, saying he became "enraged" and "stormed out" of his vehicle after Plaintiff (Carol Decker Dep. 42). Even if this were true, however, it does not contradict the fact that Plaintiff put Norfleet in apprehension of, and did in fact make, an unconsented touching. This provided Officer Norfleet with ample probable cause to effect an arrest of Plaintiff for assault. *See* Tenn. Code Ann. § 39-13-101(a) ("A person commits assault who . . . [i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative."); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

Accordingly, the Court will **GRANT** Defendants' motion for summary judgment on this claim.

### C. State Law Claims for Assault and Battery

Defendants argue the Tennessee Governmental Tort Liability Act ("TGTLA") renders them immune from Plaintiff's claims for the intentional torts of assault and battery. Plaintiff offers no response to Defendants' TGTLA argument.

The TGTLA removes governmental entities' immunity from suit "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment." Tenn. Code Ann. § 29-20-205. That is, governmental entities retain potential liability for intentional torts committed by their employees within the scope of employment. *See Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 81 (Tenn. 2001). However, "[n]o claim may be brought against an employee or judgment entered against an employee for damages for which the immunity of the governmental

17

entity is removed by this chapter unless the claim is one for medical malpractice brought against a health care practitioner." Tenn. Code Ann. § 29-20-310(b); *accord Hill v. City of Germantown*, 31 S.W.3d 234, 235 (Tenn. 2000) ("[W]e hold that Tenn. Code Ann. § 29-20-310(b) precludes the entry of a judgment against the employee when the governmental entity's immunity from suit has been removed pursuant to Tenn. Code Ann. §§ 29-20-202 to - 205.").

Here, Defendants were police officers employed by the City of Athens and acting within the scope of their duties as police officers, as Plaintiff alleges (Compl. ¶¶ 11–12). Because the city of Athens itself would retain liability for the intentional torts Plaintiff has alleged (assuming it had not already been dismissed from the action), the individual Defendants' liability for those torts is precluded by § 29-20-310(b). Accordingly, Plaintiff cannot maintain a claim against Defendants for assault and battery, and the Court will **GRANT** them summary judgment on this claim.

### D. Attorney's Fees under 42 U.S.C. § 1988; Plaintiff's Other Damages

Defendants move for summary judgment on Plaintiff's claim for attorney's fees under § 1988, while Plaintiff urges the Court to keep the § 1988 claim alive because he believes he has a valid § 1983 claim. By its plain language, § 1988 requires a party to prevail in order to be awarded a reasonable attorney's fee. Because the analysis above shows Plaintiff cannot prevail on any of his § 1983 causes of action, he cannot be a prevailing party. Accordingly, the Court will **GRANT** summary judgment on Plaintiff's § 1988 claim.

Finally, because the Court has granted summary judgment on the merits of all of Plaintiff's claims, it is impossible for Plaintiff to receive damages. Accordingly, the Court need not reach Defendant's summary judgment argument concerning Plaintiff's claimed damages.

## IV. CONCLUSION

18

For the foregoing reasons, the Court will **GRANT** Defendants' motion for summary judgment and will **DISMISS** the case.

An Order shall enter.

                                            **/s/**
                                            **CURTIS L. COLLIER**
                                            **CHIEF UNITED STATES DISTRICT JUDGE**